CONFEDERATE MEMORIAL ASS'N v. SHAUGHNESSY.

(Circuit Court of Appeals, Second Circuit. June 29, 1906.)

No. 238.

CONTRACTS—CONSTRUCTION—COMMISSIONS ON SUBSCRIPTIONS TO MEMORIAL ASSOCIATION.

An ex-confederate soldier of the Civil War originated a project for building a memorial hall for confederate relics and archives, and made a subscription of $100,000 for the purpose on condition that an equal amount be otherwise obtained. Subsequently, for the purpose of raising such sum and carrying out the project, defendant, the Confederate Memorial Association, was incorporated and plaintiff was elected superintendent and secretary under a contract by which he was to take charge of collecting funds, and as compensation for "his services to be hereafter rendered," was to receive a fixed salary and expenses and also a commission of 25 per cent. "of the first $200,000 raised by him and 20 per cent. of all other amounts * * * raised by him * * * to be due and payable when moneys are collected, and shall be reserved out of each particular donation." Held, that such contract was plain and unambiguous, and could not be construed to entitle plaintiff to a commission on the original $100,000 subscription which he had no part in raising, and especially in view of the subsequent conduct of the parties which plainly indicated that it was not so understood by either.

In Error to the Circuit Court of the United States for the Eastern District of New York.

On writ of error to the Circuit Court of the Eastern District of New York to review a judgment entered upon the verdict of a jury in favor of the plaintiff for $16,228. The action was brought by the plaintiff, as assignee of John C. Underwood, to recover a balance alleged to be due the said Underwood under a contract with the defendant whereby the association agreed to pay him an annual salary as superintendent and secretary and also a commission of 25 per cent. on the first $200,000, and 20 per cent. on all sums above said amount, raised and collected by him for the memorial fund of the association. The ultimate object of the association was to secure sufficient funds to erect a so-called "Battle Abbey" or permanent museum hall for the confederate relics and archives. The principal defense is that Underwood did not raise or collect the amounts upon which he seeks to recover commissions. At the close of the plaintiff's case, and again at the close of the evidence, the defendant moved to dismiss the complaint and for the direction of a verdict for the defendant on the ground that the plaintiff had failed to prove a cause of action. The court refused to grant the motion, and the defendant excepted. The refusal to grant these motions is duly assigned as error.

A. Snowdon Marshall, for plaintiff in error.

William Lindsay, for defendant in error.

Before WALLACE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge (after stating the facts). The project of "The South's Battle Abbey" originated with Charles Broadway Rouss, formerly of Winchester, Va., a private in the Confederate Army and subsequently a successful merchant in New York. He conceived the idea, suggested the plans for a memorial hall and, in order to give the project an auspicious start, made a cash subscription of $100,000. The announcement of this gift was made at a reunion of confederate soldiers, held at Houston, in May, 1895. The record of the proceedings concludes as follows:

"When the storm of applause which greeted this announcement subsided Gen. Gordon moved that the thanks of the veterans and greeting be sent to Charles Broadway Rouss, expressing their deep gratitude for his munificent gift, and heartfelt sympathy for the misfortune to his eyesight, which all hoped would be only temporary. This was carried amidst the wildest applause, and by a rising vote. Gen. Gordon then moved that a committee, to be composed of one member to be named by each southern state, or division, be appointed to examine into and report upon the plan submitted by Charles Broadway Rouss, which was unanimously adopted."

Of this sum $60,000 was paid by Mr. Rouss during his lifetime, $40,000 has, apparently, not been paid, and yet Underwood, the plaintiff's assignor, insists that he is entitled to a commission of 25 per cent. on the entire $100,000 upon the theory that he raised and collected that amount. Upon this theory he succeeded in the Circuit Court. It is well to keep this fact in mind as we proceed to the consideration of the other facts.

The subscription of Mr. Rouss was upon the condition that a like sum should be raised from other sources. Various plans were suggested for securing the amount proposed and on August 6, 1896, the defendant association was organized under the laws of Mississippi. On November 12, 1896, the association entered into the contract with Underwood on which this action is based. By the terms of this contract, so far as applicable to the present controversy, Underwood agreed: First. To perform the duties of super-

intendent and secretary as expressed in the by-laws. Second. To keep a true and accurate account of all subscriptions to the memorial fund that may be obtained and moneys that shall be paid thereon for final report. The association agreed as compensation for "his services hereafter to be rendered": First. To pay Underwood, from and after November 1, 1896, an unconditional salary of $4,000 per annum. Second. To pay him a commission of 25 per cent. of the first $200,000 raised by him and 20 per cent. of all other amounts over and above the said sum of $200,000 raised by him. "The said commissions to be due and payable when moneys are collected and shall be reserved out of each particular donation; and the remainders only as net subscriptions to the memorial fund, shall be turned over to the treasurer of the said association as prescribed by law." Third. To furnish him an office, stenographer, stationery and traveling expenses.

Immediately prior to making the contract Underwood, in company with Gen. W. D. Chipley, president of the association, had an interview with Mr. Rouss in which Underwood stated that it would be impossible to raise the $100,000, needed to secure the Rouss subscription, in the South and proposed that he be permitted to canvass the North and West as well. To this Rouss at first demurred, thinking, quite naturally, that a memorial designed to perpetuate the memories of the Southern Confederacy should be paid for by the people of the South and that it would be distasteful to them to have the money for such a purpose subscribed at the North. After hearing that it was impossible to raise the amount in the southern states Rouss concluded to waive his objection and modify his original purpose by permitting the money necessary to duplicate his donation to be raised without territorial limitation. So that, prior to the contract, Rouss had obligated himself unconditionally to pay $100,000 when a like sum, no matter from what source, was raised by the association. In order to assist Underwood in securing the needed amount Rouss agreed for a time to pay six per cent. annual interest on his subscription "as working capital" to carry on temporarily the business of the association. Rouss also promised not to defer the payment of the $100,000 subscribed by him until a like sum had been raised by Underwood, but he agreed to cover all sums so raised, without limitation as to time, upon being notified of their being properly deposited. In this way Rouss paid $60,000. The substance of this agreement on the part of Rouss was reduced to writing by Underwood, presented to Rouss and signed by him. The paper is dated January 12, 1898. The reason given for obtaining this paper was that Underwood might have something tangible to show to persons from whom he was soliciting subscriptions. In May, 1899, the contract with Underwood was renewed for two years and modified. The modification was reduced to writing at a meeting of the executive committee of the board of trustees of the defendant, held at Washington, January 17, 1901, and is as follows:

"It was agreed between the executive committee and John C. Underwood, superintendent and secretary, at the meeting of the board of trustees at Charleston in May, 1899, at which time said John C. Underwood was re-elected to

his present position, that his compensation shall continue the same as provided for in the contract in writing heretofore made, except that the payment of his salary of four thousand dollars ($4,000) per annum shall be deferred until he shall have raised the sum of one hundred thousand dollars ($100,000) including that already raised by him and paid over, less his commissions, to the association or its proper officer; provided that the contribution of C. B. Rouss shall not be estimated therein; and it was further agreed that such salary commencing on the 1st day of June, 1899, shall be paid out of the cash subscriptions raised by him over and above said sum of one hundred thousand dollars ($100,000)."

In our opinion the contract of November 12, 1896, is explicit and unambiguous, needing no interpretation or construction. Before it was signed Rouss, the originator of the entire scheme, had promised to give $100,000 on the sole condition that a like sum should be raised by the defendant. All limitation as to time and place where money was to be raised had been waived by him. He had even gone so far as to offer to pay $6,000 annual interest on his subscription to be used to defray the expenses of Underwood in securing the rest of the fund. At the interview, which culminated in making the contract, Rouss paid to Gen. Chipley $1,000 for this purpose. So that, before Underwood finally undertook the work, every obstacle suggested by him had been removed and Rouss had even supplemented his original offer by agreeing, for a time at least, to pay the expenses of those engaged in duplicating his subscription. That Rouss had bound himself legally and morally to pay the $100,000 we have no doubt and it is manifest that both parties to the contract so understood the situation. For what purpose was the contract made? Was it to "raise" $100,000 from Rouss? Certainly not! The plan was his; he had not only promised to pay but was doing everything in his power to hasten the day when payment would be necessary. It is perfectly plain from the contract itself and from all the antecedent circumstances that Underwood was employed solely for the purpose of raising the $100,000 necessary to secure the Rouss subscription. That subscription was the foundation of the entire movement. It was recognized by all as an absolute verity. To secure it the defendant was organized, trustees were elected, committees appointed and a superintendent and secretary chosen. Underwood agreed "to keep a true and accurate account of all subscriptions to the memorial fund that may be obtained." The subscription of Rouss was obtained long prior to November 12, 1896.

The contract provides "that as compensation for his services hereafter to be rendered Underwood shall receive a yearly salary of $4,000, and a commission of 25 per cent. of the first $200,000 he raises." Can it be supposed that when the defendant agreed to pay a commission for money raised by Underwood after November 12, 1896, either he or the association intended that language to apply to a subscription made over a year previously and which had been settled in all its minute details before the contract was made? If Underwood succeeded in securing the $100,000 within a year he would on this hypothesis receive in addition to his salary and expenses the sum of $50,000, leaving but $150,000 to build a $200,000

memorial building. It is inconceivable that the men connected with this enterprise intended to make a present to Underwood of $25,000. Would it not have been regarded as a breach of trust thus to have depleted the funds of the association? In any view, if this had been the intention of the parties would they not have made their purpose clear? Would Underwood have accepted an agreement to pay him a percentage on sums "hereafter" raised by him if he expected to receive $25,000 on a subscription with which he apparently had nothing to do in the future? If, however, interpretation were needed we think the conduct and declarations of Underwood indicate that at the time and long after the signing of the contract he understood its provisions as the defendant does to-day. Thus we find him continually alluding to the "generous subscription," "munificent donation" and "proffered donation" of Rouss and the necessity of "raising" funds to duplicate it.

By the terms of the contract commissions were to be deducted from each particular donation and the remainder only turned over to the treasurer of the association, and yet, in a letter to Rouss, dated January 1, 1902, giving a complete account of his stewardship, Underwood makes no charge or claim for commissions on the amounts paid him by Rouss; stating that the full amount so received was paid to the treasurer. "The treasurer has to his credit * * * from C. B. Rouss $60,000." The letter shows that in every other instance the commission was deducted. It is true that Underwood made a claim in the previous January for commissions on the Rouss money, but it was promptly rejected by the executive committee to whom it was suggested and frequently thereafter he alluded to the sum "collected" by him which did not include the Rouss payment.

It is argued that the renewal of the contract in May, 1899, which was reduced to writing at the Washington meeting of the executive committee, is a recognition of the claim for commissions on the Rouss money. It is contended that without the proviso, quoted above, the payment of Underwood's salary would have been deferred no longer than the time when he would raise $100,000 including the Rouss money, thus showing that it was the understanding that the commission of 25 per cent. was to apply to the money raised from Rouss as well as from others. We think this a strained and unnatural interpretation, especially when it is recollected that the record was made at the Washington meeting where Underwood for the first time presented his claim for commissions on the Rouss money and where it was vehemently repudiated by the committee. We think the proviso was added for greater caution in order that the minutes might show that the claim was disallowed by the committee. It may be that the language is not well chosen from a legal point of view, but to assert that the committee intended to put in writing an allowance of a claim, which they had at the same meeting almost indignantly rejected, is to do violence alike to the rules of evidence and of common sense.

The so-called "Rouss Guarantee" added nothing to his previous obligation; it was a concession made to Underwood to help him in

his work of collecting funds. The payment by installments, instead of in a lump sum at the end, enabled him to show better results to those from whom he was soliciting subscriptions. He did not raise the money because Rouss consented to pay it in nine payments instead of one payment.

We do not discuss the other exceptions assigned as error, for the reason that we are convinced that there can be no recovery for commissions on the Rouss subscription.

Judgment reversed with costs.